ARNOLD & PORTER LLP

399 Park Avenue

New York, New York 10022-4690

Telephone: (212) 715-1000

Facsimile: (212) 715-1399

Michael J. Canning (MC 8060)

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Quebecor World (USA) Inc., <u>et al.</u>, | Case No. 08-10152 (___) <br> Jointly Administered |
| Debtors. | Honorable _____ |

**MOTION OF THE DEBTORS FOR ENTRY OF AN INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO CONTINUE TO PAY AND HONOR CERTAIN PREPETITION CLAIMS FOR (I) WAGES, SALARIES, COMMISSIONS, EMPLOYEE BENEFITS AND OTHER COMPENSATION, (II) WITHHOLDINGS AND DEDUCTIONS AND (III) REIMBURSABLE EXPENSES; (B) AUTHORIZING THE DEBTORS TO CONTINUE TO PROVIDE EMPLOYEE BENEFITS IN THE ORDINARY COURSE OF BUSINESS; (C) AUTHORIZING THE DEBTORS TO PAY ALL RELATED COSTS AND EXPENSES; (D) DIRECTING BANKS TO RECEIVE, PROCESS, HONOR AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND ELECTRONIC PAYMENT REQUESTS RELATING TO THE FOREGOING; <u>AND (E) SETTING A FINAL HEARING</u>**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[1] move this Court (the "Motion") for the entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to continue to pay and honor the Employee Obligations specifically as set forth herein; (b) authorizing the Debtors to continue to provide the employee benefits in the ordinary course of business; (c) authorizing the Debtors to pay all related costs and expenses; and (d) directing banks to receive, honor and pay all checks and electronic payment requests related to the foregoing; (e) setting a final hearing (the "Final Hearing") on this Motion and related matters; and (f) granting such other further relief as is just and proper. In support of this Motion, the Debtors rely on the Declaration of Jeremy Roberts in support of Chapter 11 Petitions and First Day Orders (the "Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] Contemporaneously, herewith, the Debtors have filed a motion to have their Chapter 11 cases consolidated for procedural purposes and jointly administered. The Debtors are the following entities: Quebecor World (USA) Inc., Quebecor Printing Holding Company, Quebecor World Capital Corporation, Quebecor World Capital II GP, Quebecor World Capital II LLC, WCZ, LLC, Quebecor World Lease GP, Quebecor World Lease LLC, QW Memphis Corp., The Webb Company, Quebecor World Printing (USA) Corp., Quebecor World Loveland Inc., Quebecor World Systems Inc., Quebecor World San Jose Inc., Quebecor World Buffalo Inc., Quebecor World Johnson & Hardin Co., Quebecor World Northeast Graphics Inc., Quebecor World UP / Graphics Inc., Quebecor World Great Western Publishing Inc., Quebecor World DB Acquisition Corp., WCP-D, INC., Quebecor World Taconic Holdings Inc., Quebecor World Retail Printing Corporation, Quebecor World Arcata Corp., Quebecor World Nevada Inc., Quebecor World Atglen Inc., Quebecor World Krueger Acquisition Corp., Quebecor World Book Services LLC, Quebecor World Dubuque Inc., Quebecor World Pendell Inc., Quebecor World Fairfield Inc., QW New York Corp., Quebecor World Dallas II Inc., Quebecor World Nevada II LLC, Quebecor World Dallas, L.P., Quebecor World Mt. Morris II LLC, Quebecor World Petty Printing Inc., Quebecor World Hazleton Inc., Quebecor World Olive Branch Inc., Quebecor World Dittler Brothers Inc., Quebecor World Atlanta II LLC, Quebecor World RAI Inc., Quebecor World KRI Inc., Quebecor World Century Graphics Corporation, Quebecor World Waukee Inc., Quebecor World Logistics Inc., Quebecor World Mid-South Press Corporation, Quebecor Printing Aviation Inc., Quebecor World Eusey Press Inc., Quebecor World Infiniti Graphics Inc., Quebecor World Magna Graphic Inc., Quebecor World Lincoln Inc, and Quebecor World Memphis LLC.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), 507(a)(3) and 507(a)(4) of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.      On January 21, 2008 (the "Petition Date"), the 53 Debtors filed their voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in this case.

6.      On January 20, 2008 the Debtors' corporate parent, Quebecor World, Inc. ("QWI") together with each of the Debtors commenced a proceeding before the Superior Court, Commercial Division, for the Judicial District of Montreal (the "Canadian Court") for a plan of compromise or arrangement (the "Canadian Proceeding") under the Canadian Companies' Creditors Arrangement Act ("CCAA").[2]  Each of the Debtors was joined in the Canadian Proceeding, in order that each Debtor may obtain the protection of a stay under the CCAA as well as under the Bankruptcy Code.

---

[2]      The Canadian Court appointed Ernst & Young, Inc. to serve as Monitor for the Canadian Proceeding, and UBS Investment Bank is serving as a financial advisor to the Canadian Affiliates.

## I.    The Debtors' Business

7.      The Debtors collectively operate the second largest commercial printing business in the United States, maintaining approximately 78 facilities in 29 states. QWI is a Canadian corporation and the corporate parent of the Debtors, having been incorporated on February 23, 1989 pursuant to the Canada Business Corporations Act to combine the assets constituting what was then the printing division of Quebecor Inc. (QWI, together with the Debtors and all of QWI's debtor and non-debtor subsidiaries and affiliates are referred to herein as "QW World"). QWI is a public company with shares listed on the Toronto Stock Exchange and the New York Stock Exchange, and its registered and principal office is located in the City of Montreal in the Province of Quebec, Canada.

8.      QW World's United States assets and operations are organized under QWI's principal United States subsidiary, Quebecor World (USA) Inc. ("QWUSA"). QWUSA, one of the Debtors, is a wholly-owned subsidiary of Quebecor Printing Holding Company ("QPCH"), also a Debtor, and a direct, wholly-owned subsidiary of QWI. As the corporate parent of QW World's United States subsidiaries, QWUSA oversees the Debtors' cash management, operations, employee matters and other areas. In addition, QWUSA is a party to certain of the Debtors' prepetition financing agreements.

9.      In addition to the Debtors' operations and assets in the United States, and QWI's operations and assets in Canada, QW World has operations and assets in Latin America, Europe and Asia, which are not the subject of any bankruptcy or insolvency proceeding. In Canada, QW World is the second largest commercial printer with 16 facilities in 5 provinces through which QW World offers a diversified mix of printed products and related value-added services, both to the Canadian market and internationally. QW World is also the largest independent commercial printer in Europe with 17 facilities operating in Austria, Belgium, Finland, France, Spain,

Sweden, Switzerland and the United Kingdom, and is the largest commercial printer in Latin America with eight facilities, and has one facility in India.

10.     For the year ending December 31, 2006, approximately 79% of QW World's revenue was derived from North American operations, 17% from European operations and 4% from Latin American operations.  QW World's operations in the United States account for approximately 62% of overall revenue.

11.     QW World's key customers include the largest publishers, retailers and catalogers in the geographic areas in which QW World operates.  In the magazine group, QW World prints magazines for publishers, including, for example, 15 magazine titles for Time, Inc.,[3] Cosmopolitan for Hearst Corp., *Elle* for Hachette-Filippachi  Magazines US, *ESPN the Magazine* for Walt Disney Corp., *Forbes* for Forbes Inc. and *In Touch Weekly* for Bauer Publishing USA, while QW World's retail insert group includes customers such as CVS, Sears, JC Penney, Kohl's,  and Walgreens.  QW World's operations also encompass (a) catalogues for customers such as Williams-Sonoma, Oriental Trading Company, Victoria's Secret, IKEA, Cabelas and Bass Pro, (b) books for McGraw-Hill, Scholastic, Simon & Schuster, Thomas Nelson, Time-Warner and Pearson Education, (c) directories for Yellow Book USA, RH Donnelly, Windstream and Frontier in the United States, the Yellow Pages Group in Canada, as well as Telemex and Telefonica in Latin America and (d) direct mail services.

12.     QW World's sales and marketing activities are highly integrated and reflect an increasingly global approach to customers' needs, complemented by product specific sales efforts.  Sales representatives are located in plants or in regional offices throughout North

---

[3]     These include *Time*, *Fortune*, *Money*, *Sports Illustrated*, *People*, *Entertainment Weekly*, *Southern Living*, *Cooking Light* and *Coastal Living*.

America, Europe and Latin America, and customers are able to coordinate simultaneous printing throughout QW World's network through a single sales representative.

13.     Not surprisingly, the principal raw materials used in QW World's businesses are paper and ink.  The Debtors, together with their non-debtor affiliates, utilize centralized raw material purchases in order to avoid administrative complications and realize cost benefits from efficiencies of scale.  For most purchases, QW World negotiates with a limited number of suppliers to maximize purchasing power, although QW World does not rely on any single supplier.

14.     Much of the Debtors' business is seasonal, with the majority of historical operating income occurring during the second half of the financial year.  This is primarily due to seasonal advertising patterns and the related higher number of magazine pages, new product launches and back-to-school, retail and holiday catalogue promotions.  Because the Debtors depend on advertising for a significant portion of their revenue, operating results are also sensitive to prevailing economic conditions.

## II.      The Debtors' Industry

15.     Commercial printing is a highly fragmented, capital intensive industry.  The North American, European and Latin American printing industries are very competitive in most product categories and geographic regions.  The Debtors estimate that in 2006, in the United States alone, there were approximately 30,700 commercial printers, with industry analysts considering most of the industry's markets to be currently oversupplied – and competition is significant.  Competition is largely based on price, quality, range of services offered, distribution capabilities, customer service, availability of printing time on appropriate equipment and state-of-the-art technology.

16.     In addition to competition from other commercial printers, technological changes continue to erode the Debtors' businesses, as increased accessibility and quality of electronic alternatives to the traditional delivery of printed documents, through the increased use of the internet and the electronic distribution of media content, documents and data, which provide consumers with virtually instant access to information.  Nevertheless, while such trends put pressure on the Debtors' operations, the Debtors believe printed media will continue to play a strong role in marketing, advertising and publishing.

**III.     Prepetition Credit Obligations and Receivables Facility**

17.     The principal debt obligations and receivables facility of the Debtors currently outstanding consist of:

(a)     $750 million revolving credit facility with a bank syndicate under which the Royal Bank of Canada is administrative agent, secured up to a maximum of $135 million by (i) unlimited guaranties, dated on or about October 26, 2007 from certain of the Debtors; (ii) a pledge of the shares of Debtor QW Memphis Corp. ("QW Memphis") by Debtors QWUSA, the Webb Company and Quebecor World Memphis LLC, dated October 26, 2007; (iii) a pledge of the shares of QWUSA by QPHC, dated October 26, 2007; (iv) security on all personal and real property of QW Memphis, dated October 26, 2007, excluding accounts receivable subject to the North American receivable sale program and certain real estate located in Covington, Tennessee; and (v) security on all inventory of QWI located in Canada, dated October 26, 2007.  As of January 11, 2008, the aggregate amount of indebtedness outstanding under the Bank Syndicate Agreement was approximately $735 million.

(b)     An equipment financing agreement dated as of January 13, 2006 (as amended) among QWI, as borrower, QWUSA, as guarantor, and Société Générale (Canada) ("Soc Gen"), as lender, providing for an equipment financing credit facility in the aggregate amount of the Canadian dollar equivalent of €136,165,415 expiring on July 1, 2015.[4]  The equipment financing facility is guaranteed and secured on a pari passu basis up to $35 million by the same collateral as the credit facilities under the bank syndicate agreement.  As of January 11, 2008, the aggregate amount

---

[4]     As of January 15, 2008, this is equivalent to approximately U.S. $202,571,926.

outstanding under the Equipment Financing Agreement was approximately $155 million.

(c)    Certain of the Debtors and QWI are obligors under note issuances consisting of (i) an indenture dated as of November 3, 2003 among Quebecor World Capital Corporation ("QWCC"), as issuer, QWI, as guarantor, and Wilmington Trust Company, as trustee, providing for the issuance of 4.875% senior notes due in 2008 and 6.125% senior notes due in 2013. The aggregate amounts outstanding under such notes as of September 30, 2007 were $199.9 million and $398.2 million, respectively; (ii) an indenture dated as of December 18, 2006 among QWI, as issuer, QWUSA, Quebecor World Capital LLC ("QWLLC") as predecessor in interest to Quebecor World Capital II LLC ("QWLLC II") and Quebecor World Capital ULC ("QWULC") as predecessor in interest to Quebecor World Capital II GP ("QWCGP"), as guarantors, and Wilmington Trust Company, as trustee, providing for the issuance of 9.75% senior notes due in 2015. The aggregate amount outstanding under such notes as of September 30, 2007 was $400 million; (iii) an indenture dated as of March 6, 2006 among QWULC as predecessor in interest to QWCGP, as issuer, QWI, QWUSA and QWLLC as predecessor in interest to QWLLC II, as guarantors, and Wilmington Trust Company, as trustee, providing for the issuance of 8.75% senior notes due in 2016. The aggregate amount outstanding under such notes as of September 30, 2007 was $450 million; and (iv) an indenture dated as of January 22, 1997 among QWCC, as issuer, QWI (then known as Quebecor Printing Inc.), as guarantor, and The Bank of New York, as trustee, providing for the issuance of 6.50% senior notes due in 2027. The aggregate amount outstanding under such notes as of September 30, 2007 was $3.2 million. The terms and conditions of the Note Issuances limit the aggregate amount of secured indebtedness that may be incurred under the Bank Syndicate Agreement and the Equipment Finance Agreement to approximately $170 million.

(d)    QWI and certain of the Debtors are parties to an accounts receivable facility pursuant to: (i) a Canadian receivables purchase agreement dated as of October 24, 2007 between QWI, as seller, and Quebecor World Finance Inc. ("QWF"), as purchaser, whereby QWI sells, with limited recourse, its Canadian trade receivables on a revolving basis in an amount not to exceed $135 million Canadian; (ii) a U.S. receivables purchase agreement dated as of September 24, 1999 (as amended) among certain Debtors, as sellers, and QWF, as purchaser, whereby the sellers sold, with limited recourse, all of their U.S. trade receivables on a revolving basis in an amount not to exceed $408 million ($459 million during peak season); and (iii) an amended and restated receivables sale agreement dated as of September 24, 1999, as amended and restated as of December 22, 1999 (as further amended the "RSA") among, inter alia, QWF, as seller, the purchasers party thereto and ABN Amro Bank N.V., as agent ("ABN"). Pursuant to the RSA, ABN holds a first priority lien on all of the Debtors'

and QWI's accounts receivable purchased by QWF under the respective Canadian and U.S. receivables purchase agreements. The Canadian receivables program was rolled into the U.S. receivable program on or about October 24, 2007, and as of December 31, 2007 the aggregate amount outstanding on account of the Debtors' accounts receivable subject to the RSA was approximately $428 million.

## IV.    Developments Necessitating Restructuring

18.    QWI's financial performance has suffered in the past few years, especially with respect to its European operations, as a result of a combination of factors, including declining prices and sales volume, and a temporary disturbance caused by a major retooling of its printing operations initiated in 2002. While it has substantially completed its retooling program in North America, and achieved, and even surpassed, its cost reduction objectives, QWI has not yet met its forecasted earnings projections. Rather, the combination of significant capital investments and continued operating losses, principally as a result of its European operations, together with the write down of its European assets, including goodwill, has resulted in increased financing needs. During this period, it was also necessary for QWI to repurchase certain private notes in order to avoid breaching certain debt to equity ratios, while also facing reduction in amounts available under the Bank Syndicate Agreement. These factors have had a significant impact on all of the members of QW World's corporate family, and, accordingly, have adversely impacted the Debtors' operations and financial position.

19.    More recent events have further complicated the Debtors' efforts to improve their balance sheets and financial position. First, on November 13, 2007, QWI announced a refinancing plan consisting of a $250 million equity offering and a $500 million debt offering. On November 20, 2007, however, QWI announced the withdrawal of such refinancing plan due to adverse financial market conditions. Second, on December 13, 2007, QWI announced that it would not be able to consummate a previously announced transaction to sell its European

operations, which would have resulted in proceeds to QWI of approximately $341 million, to be paid in cash, shares and through the assumption of indebtedness.

20.    In 2006, restructuring initiatives related to the closure or downsizing of various facilities were undertaken, mainly in connection with the North American and European operations, including the closure of printing and binding facilities in Illinois in the catalogue group, the closure of the Kingsport, Tennessee facility in the book group, and the closure of the Red Bank, Ohio, and the Brookfield, Wisconsin facilities in the magazine group, which further affected the Debtors' liquidity.

21.    Although the Debtors have to date aggressively sought to raise additional funds, they have not been successful, and the lenders under the Bank Syndicate Agreement have recently indicated that they will not provide any further advances under the bank facility beyond those currently permitted.  Facing year end covenant defaults under the Bank Syndicate Agreement, the Debtors and QWI obtained a waiver from the bank syndicate lenders and from the sponsors of its North American securitization program, subject to the satisfaction of certain conditions and refinancing milestones, including obtaining $125 million in new financing by January 15, 2008.  The Debtors and QWI were not successful in satisfying the conditions and refinancing milestones set by the bank syndicate lenders.

22.    Moreover, the Debtors are currently facing a severe liquidity crisis.  Even if operations were conducted in the normal course of business, the Debtors' cash flow projections indicate that they will require approximately $225 million to satisfy their obligations through the end of January 2008, with virtually no availability under the Bank Syndicate Agreement.  In this regard, as of November 30, 2007 QWI had aggregate outstanding trade payables of approximately $526.7 million, of which approximately $120 million are attributable to the Debtors, $135 million are attributable to QWI's other North American operations, $211 million

are attributable to the European operations and $60.6 million are attributable to Latin America operations.  In addition to ordinary course payments, QWI was also contractually obligated to make debt payments of approximately $19.5 million by January 15, 2008 which were not paid and to make payments related to pension obligations of approximately $10 million. which were only partially made.

23.     Quite simply, QWI and the Debtors do not have sufficient liquid resources to pay obligations that either are now due or are expected to become due in January, 2008.  The lenders under the Bank Syndicate Agreement have indicated that they will not provide any advances under the bank facility beyond those currently permitted under the Bank Syndicate Agreement, suppliers are demanding cash terms and customers are threatening to cease doing business with QWI and the Debtors altogether unless letters of credit or similar accommodations are provided to such customers.

24.     Although the Debtors represent a significant portion of the operations of QWI – a global leader in the printing field – and enjoy significant competitive advantages and a strong customer base, the fact remains that their current financial situation cannot continue.  The Debtors' overall businesses remain viable and stable, but restructuring changes must be made, including the discontinuance of business segments that cannot be made profitable and the streamlining of other business segments to increase profitability, in order to return the Debtors to financial health.

## Relief Requested

25.     The Debtors[5] employ approximately 19,531 employees (the "Employees"), of whom approximately 17,359 are full-time employees and 1,947 are part-time or contract employees.  A total of 15,473 employees are paid on a hourly basis (the "Hourly Employees") and 3,170 are paid on a salary basis (the "Salaried Employees").  In addition, certain sales force employees are paid principally through commissions on the sales they generate (the "Commissioned Employees").

26.     Of the total employees, 4,380 are members of unions (the "Union Employees") and some of these Union Employees are participants in collective bargaining agreements (the "Collective Bargaining Agreements").  There are a total of 28 collective bargaining units at Quebecor World (USA) Inc. and its debtor and non-debtor subsidiaries.

27.     The Debtors have a highly skilled and dedicated labor force.  The Employees perform a wide range of critical functions.  These tasks can be divided into three general categories:  (1) press room workers, (2) bindery workers, and (3) sales and general support staff. The following describes some of the main tasks of these Employees: (1) press room workers ensure that the customers' printed product is produced and these employees are tasked with operating and maintaining large web offset and gravure presses; (2) bindery workers operate a variety of equipment that involves the binding together of printed pages into magazines, catalogs, books and directories; and (3) sales and general support staff provide services related to

---

[5]     Some of the estimated numbers in this Motion relating to total employees, employer contributions, and other similar terms describing the financials of the Debtors, including the total paid or owing by the Debtors on behalf of their Employees, include numbers attributable to the Debtors and their non-debtor subsidiaries in the United States.  The numbers and amounts that may be attributable to the non-debtor subsidiaries are immaterial to the overall Employee expenses.

sales and marketing, staffing for customer service, scheduling, quality control, shipping and receiving, accounts payable, and accounts receivable.

28. As stated above, the Debtors' Employees are necessary for all elements of the Debtors' businesses, including such tasks as paper handling, press maintenance, machinists, stockroom maintenance, shipping and receiving, and sales. The Employees' skills, knowledge and understanding of the Debtors' infrastructure, operations and customer relations are essential to effect a successful reorganization and to maintain the value of the Debtors' assets and businesses.

29. Through this motion, the Debtors seek the authority to pay the Employees, as set forth below, for the work the Employees performed prepetition, and to honor certain other prepetition employee-related obligations (the "Employee Obligations"). The Debtors seek this authority to minimize the personal hardship that the Employees would suffer if they are not paid when due, and to maintain the morale of their essential workforce during this critical time. The Employee Obligations which the Debtors seek authority to pay include: wages, salaries, profit sharing, Reimbursable Expenses (as defined herein), federal and state withholding taxes and other amounts withheld (e.g., garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), Employee health benefits, insurance benefits, workers' compensation insurance, vacation time, long-term disability coverage and all other Employee benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described in this Motion, the "Employee Wages and Benefits"), and to pay all fees and costs incident to the foregoing, including amounts to third-party administrators and temporary employment agencies. Because of the potential for irreparable harm if these obligations are not paid when due, the Debtors seek immediate authority to pay all of these obligations.

30.     In addition, the Debtors seek authority to continue and/or modify, in their discretion, and in the ordinary course of their business (subject to applicable Collective Bargaining Agreements and other contractual obligations), the Debtors' Employee benefit programs.

31.     Finally, the Debtors request that banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

## I.     Employee Obligations That Arose Prepetition

### A.     Unpaid Wages and Salaries

32.     Prior to the Petition Date, the Debtors completed payroll obligations and issued checks and/or electronic transfers to the Employees in the ordinary course of business.  The Debtors understand that certain checks and/or electronic transfers issued to these Employees pursuant to previous payrolls may remain outstanding as of the Petition Date due to the timing of the filing of these Chapter 11 Cases.  As part of this Motion, the Debtors request authority for applicable banks and financial institutions to honor such checks or electronic transfers on a post-petition basis or to authorize the Debtors to issue new checks or electronic transfers on a post-petition basis in the event that such obligations were not honored prior to the Petition Date.

33.     In the ordinary course of their businesses, the Debtors generally pay their Hourly Employees on a weekly basis and the Salaried Employees on a bi-weekly basis.

34.     The Debtors' payroll is generally made either by direct deposit through electronic transfer of funds directly to the Employees,  or paid by check.  The average monthly payroll paid by the Debtors for their Hourly and Salaried Employees is approximately $70 million.

35.     Employees paid weekly are paid one week in arrears, and in most cases on Friday, except for two facilities where the Employees are paid on Thursday.  That means that as of the Petition Date of January 21, 2008, these Hourly Employees will not have been paid for their work for the period January 14th to January 20th.

36.     Salaried Employees are paid bi-weekly, and are paid every other Friday for their services for the prior two weeks.  These Employees were paid on Friday, January 18th for the two-week period January 7th to January 18th.  That means that these Salaried Employees will not be owed pre-petition wages, unless they were paid by check and the check has not yet cleared.

37.     The Debtors estimate that the wages and salaries attributable to the prepetition period is approximately $15 million.  Additional compensation may be due and owing as of the Petition Date because: (a) some discrepancies may exist between the amounts paid and amounts Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; (b) as mentioned above, some payroll checks issued to Employees prior to the Petition Date may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and (c) there may be other variations in the Debtors' various payroll schedules.

38.     The Debtors believe that the total of wages, benefits and other withholdings attributable to any particular Employee is below the $10,950 limit established in Section 507 of the Bankruptcy Code.  By this Motion, the Debtors seek authority to pay all such compensation owed to these Employees.

### B. Profit Sharing

39. Certain of the Debtors' Hourly Employees and Salaried Employees participate in profit sharing plans (the "Profit Sharing Plans") under which they may receive additional compensation amounting to 3-5% of their base compensation if certain earning targets are met for a calendar year. The total amount anticipated to be payable to such Employees under this program for 2007 is $1.8 million.

40. Even with this additional payment, almost all of the affected Employees will be receiving payments on account of their prepetition services in a total amount under $10,950. Once again, it is vitally important that these Employees receive the entirety of their compensation as scheduled in order to insure the stability of the Debtors' workforce and business operations.

41. Accordingly, the Debtors request authority, as part of this Motion, to make all Profit Sharing Plan payments for 2007 to those Employees entitled thereto, provided that with respect to each such Employee the total prepetition compensation payable to such Employee does not exceed $10,950. To the extent any such payment exceeds $10,950, the Debtors will seek authority to make such payments at the Final Hearing.

### C. Payroll Deductions

42. During each pay period, the Debtors routinely deduct certain amounts from each Employee's paycheck, including, for example, (a) garnishments, (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefit Plans of the Debtors discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) contributions, legally ordered deductions and other miscellaneous deductions) (collectively, the "Deductions"), and (c) Employee funded programs and costs, such as membership fees,

participation fees for leagues, transportation, uniforms, and similar costs. The Debtors then forward those amounts (with the exception of certain amounts owing on account of self-insured programs) to various third party recipients, such as health care benefits providers.

43. The Debtors have historically deducted a total amount of approximately $2 million each week from their Employees' paychecks on account of these third party payables and programs. As a result of the commencement of the Chapter 11 Cases, certain funds that were deducted from Employees' earnings during pay periods prior to the commencement of these cases may not have been forwarded to the appropriate third party recipients prior to the Petition Date. Further, if the Court approves the Debtors' request to pay Employees' wages and salaries for services performed prepetition, such payments will generate additional deductions and amounts due and owing to third-parties. Accordingly, the Debtors seek authority to continue these ordinary course payroll deductions and payments over to the applicable third party recipients on a postpetition basis, as routinely done prior to the Petition Date.

44. The Debtors are also required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withholdings") for remittance to the appropriate federal, state or local taxing authority. The Debtors must then provide matching contributions from their own funds for social security and Medicare taxes, and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withholdings, the Debtors' pay payroll taxes (the "Payroll Taxes")). Once again, prior to the Petition Date, the Debtors withheld the amounts from Employees' earnings for the Payroll Taxes, which may not have been forwarded to the appropriate taxing authorities prior to the Petition Date, and if the Court approves the request to pay Employees' wages and salaries for services performed prepetition, such payments will generate additional payroll taxes,

withholding and employer contributions. As a result, the Debtors seek authority to continue to honor and process prepetition obligations with respect to Payroll Taxes on a post-petition basis, in the ordinary course of business.

### D. Reimbursable Expenses

45. Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment in accordance with applicable Internal Revenue Service regulations (the "Reimbursable Expenses").

46. A Reimbursable Expense is an expense incurred by an Employee in the performance of his/her duties that is deemed to be necessary to the performance of his/her job, and is reasonable. These expenses include, but are not limited to, expenses such as transportation, meals and travel. A Reimbursable Expense is made to an Employee when a duly completed and approved expense report ("Expense Report") is submitted by such Employee to the appropriate accounts payable department and is thereafter processed.

47. Employees are also permitted to use an American Express "personnel" card under the Debtors' corporate program, which means that although an Employee is solely responsible for reimbursing American Express the card amount, the Employee can prepare an expense report for any Reimbursable Expenses using an American Express web-based system, which facilitates the Employee's being reimbursed by the Debtors. Certain Employees are also entitled to use a corporate credit card to pay for Reimbursable Expenses, which is paid monthly by the Debtors in the ordinary course of business.

48. It is likely that certain Employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date. In this regard, it is difficult for the Debtors to

estimate the amount of Reimbursable Expenses outstanding as of the Petition Date because not all Employees may have submitted Expense Reports for all accrued expenses. Nevertheless, it is critical that the Debtors be authorized to reimburse all such expenses when the reports are submitted in order to assure such Employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

49.     Historically, the Debtors spend approximately $1.25 million on Reimbursable Expenses per month. The Debtors estimate that, as of the Petition Date, approximately $180,000 in Reimbursable Expenses remain unpaid.

50.     All of the Reimbursable Expenses were incurred on the Debtors' behalf, and with the understanding that they would be reimbursed in the ordinary course. Accordingly, to avoid economic hardship to the Employees who incurred Reimbursable Expenses, which would be detrimental to critical employee morale and performance, the Debtors seek authority to pay all Reimbursable Expenses that relate to the prepetition period.

### E.     Employee Benefits

51.     In the ordinary course of business, the Debtors provide the Employees with a number of Employee Benefits, including: medical (i.e., health, vision, and dental insurance); life/accidental death and dismemberment and disability insurance benefits; flexible spending accounts; vacation pay; worker's compensation insurance; employee savings plan; a deferred compensation program; severance pay; paid leave; and other non-insured programs, including, but not limited to, tuition reimbursement programs and relocation reimbursement.

### (1)     Medical Health and Dental Plans

52.     The Debtors offer various health insurance plans to their Employees (the "Health Insurance Plans"),[6] which include medical coverage, vision care, and a dental plan.

53.     The Health Insurance Plans are essentially the same for hourly and salaried employees, and for Union Employees, with some small *de minimis* modifications.

54.     Medical expenses, including medical coverage, the drug plan, and the health care reimbursement account, are administered through the Signature 90 Account Plan and Signature 80 Account Plan (collectively, the "Signature Plans").  Through these Signature Plans, medical coverage and health care reimbursement is provided through Anthem (Blue Cross/Blue Shield), while the drug plan is provided by Caremark.

55.     The Debtors estimate that approximately 15,000 Employees participate in the medical coverage and drug plan, and 10,600 participate in the health care reimbursement plan, with the estimated annual cost to the Debtors and the Employees (i.e., combined contributions) for medical coverage being approximately $90 million and for the drug plan being approximately $14.7 million.  The fees for these plans are paid, in the regular course of business, on a monthly basis.

56.     The Debtors also offer the Employees a dental plan through Metropolitan Life Insurance ("MetLife").  Approximately 14,500 Employees participate in the dental plan and the estimated annual costs for such a plan to the Debtors and the Employees combined is approximately $8.184 million.  The fees for these plans are paid, in the regular course of business, on a monthly basis.

---

[6] The Debtors also provide health benefits to approximately 1,400 retirees.  The Debtors intend to honor all obligations with respect to the retirees pursuant to and in accordance with section 1114 of the Bankruptcy Code.

57.     Further, the Debtors offer a vision care plan through VSP, which approximately 14,500 Employees participate in.  The Debtors and the Employees estimated combined contribution to this plan annually is $1.9 million.

58.     By this Motion, the Debtors seek authority to pay any amounts owing with respect to these plans that relate to the prepetition period.

**(2)     Insurance Benefits**

59.     The Debtors provide a number of different types of insurance to their Employees, including, but not limited to, short and long term disability, life and accidental death and dismemberment (collectively, the "Insurance Benefit Programs"), which are provided by a number of carriers, including Aetna, MetLife, and Magellan Health Services.  With respect to most of these Insurance Benefit Programs the premiums are paid on a monthly basis.

60.     Approximately 15,300 Employees participate in the Debtors' life insurance plan, to which the Debtors contribute approximately $5.045 million annually.  Similarly, approximately 15,300 Employees participate in the accidental death and dismemberment plan, the short-term disability plan, and the long-term disability plan.  The Debtors estimate their annual contribution to the accidental death and dismemberment plan is $142,000, and their annual contribution to the short term disability plan is $4.73 million.  With respect to the long term disability plan, the Debtors estimate that their annual costs are approximately $2.276 million.  This amount, however, includes both the Debtors' and the Employees' contributions.

61.     Through MetLife, the Debtors also maintain a New York State mandated disability benefits plan (the "NYDBL").  The Debtors estimate that there are approximately 800 Employees who participate in this plan, for which the annual costs are approximately $577,000.  Premiums for this plan are paid on a monthly basis.

62.     The Debtors also offer an employee assistant program ("EAP"), for which Magellan Health Services is the provider.  The Debtors estimate that 15,300 Employees participate in the EAP, at an annual cost to the Debtors of approximately $400,000.  Premiums for the EAP are paid on a monthly basis.

63.     The Debtors also provide the approximately 10,600 Employees with a health care reimbursement account through Anthem (Blue Cross/Blue Shield), for which the Debtors contribute approximately $8.5 million annually.

64.     By this Motion, the Debtors seek authority to pay any amounts owing with respect to these Insurance Benefit Programs that relate to the prepetition period.

**(3)**     Flexible Spending Accounts

65.     The Debtors offer their Employees the ability to contribute a portion of their compensation into flexible spending accounts for medical and dependent care, on a pre-tax basis, under IRS Code Section 125 (the "FSA").

66.     Approximately 2,900 of the Employees participate in the FSA, for which the provider is Acceleris.  There are minimal fees associated with operating the FSA, which the Debtors estimate to be approximately $160,000 a year.

67.     By this Motion, the Debtors seek authority to pay any amounts owing with respect to the FSA that relate to the prepetition period.

**(4)**     Vacation

68.     The Debtors provide vacation time to their Employees as a paid time-off benefit ("Vacation Time").  Both Hourly and Salaried Employees are eligible to receive and use vacation time on a calendar year basis from January 1 to December 31, provided they are full-time Employees.  The following schedule is applicable for vacation eligibility per year: 1-4 years

of service = 10 days vacation; 5-9 years of service = 15 days of vacation; and 10 plus years of service = 20 days of vacation.

69.     By this Motion, the Debtors seek authority to (a) allow their Employees to take Vacation Time accrued prepetition in the ordinary course of business on a going forward basis and (b) pay unpaid vacation accrued prepetition upon termination or retirement in accordance with prior practice.  The Debtors believe that is essential that they continue to recognize vacation time accrued prepetition in accordance with their Vacation Time policy and in accordance with prior practice in order to maintain Employee morale during this difficult time.

**(5)**     Paid Leave

70.     In addition to the Vacation Time policies described above, the Debtors offer different types of paid leave (the "Paid Leave"), which include, but are not limited to, bereavement leave, jury duty, and military leave.

71.     By this Motion, the Debtors seek authority to make any payments due and owing under the Paid Leave policy that accrued prepetition.

**(6)**     401 Plans

72.     The Debtors' Employees are eligible to participate in 401 savings plans (the "401 Savings Plans").  There are two types of 401 Savings Plans offered to the Employees.  These plans are (1) the regular 401(k) (the "401(k) Plan"), and (2) the 401(A) (the "401(A) Plan").

73.     With respect to the 401(k) Plan, if an Employee contributes 2% of his/her salary, the Debtors will match this contribution.  Approximately 8,000 Employees participate in the 401(k) Plan, to which the Debtors estimate they contribute approximately $9.1 million annually.

74.     The second 401 savings plan, the 401(A) Plan, requires that in order to be eligible an Employee must have been employed with the Debtors for at least one year.  Thereafter, the Debtors will contribute 2% of such Employee's salary automatically to such Employee's 401(A)

Plan, regardless of whether the Employee contributes any of his or her salary to the plan. Approximately 12,270 Employees are eligible under this 401(A) Plan, and the Debtors estimate that they contribute approximately $11.2 million annually to the plan.

75.     By this Motion, the Debtors request authority to make payments attributable to the 401 Savings Plans that accrued prepetition.

**(7)**     Additional Employee Benefits

76.     The Debtors provide a myriad of other miscellaneous benefits (the "Miscellaneous Benefits") to their Employees, including, but not limited to: relocation benefits, education benefits, and fitness reimbursement, all of which are offered in the ordinary course.

77.     By this Motion, the Debtors seek authority to make any payments with respect to the Miscellaneous Benefits that may have accrued prepetition.

**F.     Workers' Compensation**

78.     Pursuant to applicable state laws, the Debtors maintain workers' compensation liability coverage (the "Workers' Compensation Insurance") in the ordinary course of business in order to ensure prompt and efficient payment and/or reimbursement to their Employees for workers' compensation claims.  Although each state in which the Debtors operate has different requirements and administrative procedures for implementation of their workers' compensation laws, the Debtors are currently in compliance with each state's requirements and are not in default of any of their obligations thereunder.

79.     The Debtors utilize The Travelers to administer their workers' compensation insurance program, claims receipt, processing, administration and claims payment.

80.     The Debtors estimate their payments on account of the Workers' Compensation Insurance at approximately $23 million annually, which includes both the cost of the premiums

and the cost of administering the program. In this regard, the Debtors pay the Workers' Compensation Insurance premium weekly in the ordinary course of business.

81.     Certain benefits under the Workers' Compensation Insurance program were likely awarded prepetition, but have yet to be fully paid, while certain other claims were filed prepetition, which have yet to be resolved. In order for the claims administration process to operate in an efficient manner, and to ensure that the Debtors comply with their state law requirements, claim assessment, determination and adjudication must continue uninterrupted, and the Debtors must be allowed to continue to remit payments for their Workers' Compensation Insurance in the ordinary course of business.

82.     By this Motion, the Debtors request authority to make any payments with respect to the Workers' Compensation Insurance program that relate to the prepetition period.

## II.     Prepetition Compensation to be Addressed by Subsequent Motion

83.     There are several types of prepetition compensation that the Debtors intend to seek court authorization to pay through a subsequent motion. While such authorization is not sought in this Motion, the Debtors believe it important to make clear that they have not overlooked in this Motion the groups of vitally important employees owed this prepetition compensation. The Debtors simply do not want to complicate the instant motion, which addresses only employees whose prepetition compensation payments will all be under the $10,950 priority limit, and who would ordinarily receive that compensation this week. Many of the employees to be addressed in the forthcoming motion are owed amounts in excess of $10,950. The Debtors nonetheless believe that it is crucial to their continued operation to be able to pay such amounts, but those payments are not due until sometime in February and authority to pay such amounts will be sought in advance of that time.

84.     One category of compensation in this category is for the Debtors' sales representatives who are compensated primarily on a commission basis but are only paid such commissions when the payment for the account (i.e., the sale) is actually received by the Company.  Although the bulk of the prepetition commissions represent amounts in excess of $10,940 per employee, the Debtors will seek authority to pay such amounts because such payments are critical to the viability, morale and motivation of the Debtors' sales force, and the strong performance of that sales force is absolutely essential to the success of the Debtors' business.  High performing professional sales employees are in high demand in the industry in which the Debtors operate.  Additionally, these sales employees have critical relationships with the Debtors' customers.  Accordingly, retaining such sales employees is critical to the Debtors' success and their restructuring.

85.     The Debtors also have two annual incentive plans for management.  The two plans are the Management Incentive Compensation Plan and the Plant Based Incentive Plan. The managers who are eligible for incentive payments under these plans are essential to the reorganization of the Debtors.  Without their skill, oversight, and abilities, the Debtors will be hard pressed to maintain strong operations and emerge as a viable business.  Accordingly, the Debtors will seek through a subsequent motion the authority to pay prepetition amounts due under these programs as well.

86.     The Debtors request that a hearing on any subsequent motion with respect to the Employee compensation be scheduled for February 11, 2008, or as soon thereafter as the Court can hear it, provided that any such motion is filed by February 1, 2008.

**III.     Continuation of Employee Programs**

87.     In the prior sections of this Motion, the Debtors sought authority to honor obligations that arose in connection with their Employee Programs during the prepetition period.

The Debtors also intend that these Employee Programs continue during the pendency of these cases, and seek confirmation of their authority to do so in the exercise of their business judgment and to make modifications to these programs as they deem necessary and appropriate, in each case in the ordinary course of their businesses, subject to the requirements of applicable Collective Bargaining Agreements and other contractual obligations. Continuation of the Employee Programs is critical to assuring employee morale and performance during the course of these Chapter 11 Cases.

88.     One additional program that the Debtors intend to maintain during the pendency of these cases, subject to any modifications made in the exercise of their business judgment, is their severance program, which provides severance payments to certain Employees in the event of involuntary termination (the "Severance Program") under the Debtors' Reduction in Force policy. Employees who have been terminated due to a reduction in force are eligible for participation in the Severance Program, which has a Supplemental Unemployment Benefits policy (the "SUB Plan") that applies to terminations subject to the Reduction in Force policy. The SUB Plan provides for an offset to the severance pay obligations for any unemployment benefits received by an Employee. The Debtors utilize an outside vendor (TMS) to monitor all Employees' receipt of unemployment benefits. In cases of reduction in force involving union represented Employees, the Debtors engage in bargaining with the appropriate local union and the benefits agreed to as a result of such bargaining are never in excess of the Reduction in Force policy.

**Basis For Relief**

89.     Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to continue the Employee Obligations, Employee Benefits and the Reimbursable

Expense policy and to pay all of the obligations owed thereunder as of the Petition Date, except as specifically excluded herein. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Section 105(a) of the Bankruptcy Code further provides, in pertinent part, that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

90.     The Debtors believe that the vast majority of the Employee claims it seeks to pay are entitled to priority status under sections 507(a)(3) and 507(a)(4), and do not exceed $10,950 for each Employee. The Debtors would therefore have to pay these claims in full in order to exit from these bankruptcy proceedings through confirmation of a plan of reorganization. See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries and commissions and certain allowed unsecured claims for contributions to an employee benefit plan). Thus, granting the relief sought herein would only affect the timing, and not the amount, of the payment of the Employee Obligations and the Employee Benefits, to the extent that they constitute priority claims.

91.     To the extent the payments sought to be authorized exceed the $10,950 priority limitation per employee, such payments are authorized by section 105 because they are critical to the maintenance of a strong and dedicated work force, and to the Debtors' viability and opportunities for a successful reorganization.

92.     Courts in this district have routinely granted the relief requested herein. See, e.g., In re Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 3, 2006); In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Jan. 12, 2006); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 20, 2005); In re Delphi Corp., Case No. 05-

44481 (RDD) (Bankr. S.D.N.Y. Oct. 8, 2005); In re Delta Air Lines, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 14, 2005).

93. Further, courts frequently apply section 105(a) to authorize relief in chapter 11 cases similar to that sought herein, where the debtor has a large workforce that is important to the preservation of its business. See In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987) (affirming a bankruptcy court order authorizing the debtor to pay pre-bankruptcy wages, salaries, employee benefits, reimbursements and workers' compensation claims and premiums); see also In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate" under section 105(a)); In re Gulf Air, Inc., 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989) (authorizing the debtor to pay current employees' pre-bankruptcy wages, salaries, medical benefits and business expense claims); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (same).

94. In so holding, courts typically rely on the "necessity of payment" doctrine, first enunciated by the Supreme Court in Miltenberger v. Logansport Ry. Co., 106 U.S. 286 (1882), by which courts may authorize a debtor to make postpetition payments with respect to prepetition claims where such payments are necessary for the preservation of the estate. See, e.g., In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1989) (noting that, under the necessity of payment doctrine, "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is out of corpus [of the estate]").

95. The Debtors' request to pay prepetition amounts related to Employee Wages and Benefits policies and programs easily meets the preceding standards. The failure to grant such

relief, even for a brief period of time, could have a material adverse impact on both the day-to-day operations of the Debtors' businesses and their reorganization efforts, and would run afoul of the rehabilitative nature of the Bankruptcy Code. The "fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).

96. The Debtors believe that if they are unable to honor Employee Wages and Benefits for even a short period of time, Employee morale and loyalty would be jeopardized at a time when Employee support is most critical. Many of the Debtors' Employees live from paycheck to paycheck, and rely exclusively on their full compensation and reimbursement of their expenses in order to continue to pay their daily living expenses. Regardless of the length of these Chapter 11 Cases, the Employees will be exposed to significant financial and health-related hardships if the Debtors are not permitted to pay the unpaid Employee Wages and Benefits in the ordinary course of business. Furthermore, the Debtors believe that the reorganization will be jeopardized if the Employee Wages and Benefits are not paid, as many of the Employees may seek other employment if they are not given the security of receiving full compensation and benefits.

97. Indeed, the Employees are absolutely essential to the orderly and successful reorganization of the Debtors' businesses and financial affairs. They have an intimate knowledge of the operation of the Debtors' businesses, and any deterioration in Employee morale and welfare at this critical time would undoubtedly impact the Debtors adversely, as well as the value of their assets and businesses, and ultimately their ability to reorganize.

98. The Debtors further request authorization to pay all costs incident to, among other things, the Employee Wages and Benefits, Profit Sharing, Unpaid Compensation, Reimbursable Expenses, Withholdings and Deductions, including other processing costs administration costs

and the employer portion of payroll-related taxes (collectively, the "Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid as of the Petition Date constitutes a *de minimis* amount. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third party providers with respect to the Employee Wages and Benefits, Unpaid Compensation, Withholdings, and Deductions.

99. The Debtors' request for authorization to continue to honor and remit Deductions, Payroll Taxes and other Withheld Amounts should also be approved. Such amounts principally represent Employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts) and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees as well as administrative problems for the Debtors. Indeed, the Debtors would expect numerous and frequent inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such other parties' behalf. Moreover, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' inability to submit such payments.

100. New Rule 6003 to the Federal Rules of Bankruptcy Procedure, which became effective just last month, generally precludes the Court from authorizing the payment of prepetition obligations until 20 days after the petition is filed, but there is an exception for cases of "immediate and irreparable harm." Because of this rule, the Debtors are not seeking first day relief approving the payment of commissions, incentive compensation and management bonus programs that accrued prepetition. Waiting 20 days for a ruling on such payments will not cause irreparable harm, but delay with respect to authorizing the other payments sought herein would

cause immediate and irreparable harm because of the devastating effect it would have on Employee morale and retention at this crucial juncture in these cases.

101.    Finally, the Debtors also request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors related to Employee Obligations, Employee Benefits and Reimbursable Expenses, whether such checks were presented or funds transfer requests were submitted prior to or after the Petition Date.  The Debtors represent that these checks are drawn on identifiable payroll and disbursement accounts, and that checks other than those for Employee Obligations, Employee Benefits and Reimbursable Expenses will not be honored inadvertently.

102.    For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties in interest.

103.    The Debtors are not requesting the assumption of any agreement in this Motion and, therefore, nothing contained in this Motion constitutes a request for authority to assume any policy, procedure or executory contract that may be described or referenced herein.

104.    The Debtors further request that, for judicial economy and administrative convenience, the relief requested herein continue to apply to any of the Debtors' affiliates and their respective estates that subsequently commence Chapter 11 cases in this Court without the need for any further requests or motions.

**Memorandum Of Law**

105.    This Motion includes citations to the applicable authorities and a discussion of their application to this Motion.  Accordingly, the Debtors respectfully submit that such citations and discussion satisfy the requirement that the Debtors submit a separate memorandum of law in

support of this Motion pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York.

**Notice**

106.    No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to (a) the 60 largest unsecured creditors of the Debtors, (b) the Royal Bank of Canada as administrative agent under the Bank Syndicate Agreement, (c) Société Générale (Canada), (d) Wilmington Trust Company, as trustee for the 4.875% senior notes due in 2008 and 6.125% senior notes due in 2013, (e) Wilmington Trust Company, as trustee for the 9.75% senior notes due in 2015, (f) Wilmington Trust Company, as trustee for the 8.75% senior notes due in 2016, (g) the Chase Manhattan Bank, as trustee for the 6.50% senior notes due in 2027, (h) the Debtors' proposed post-petition lenders, (i) the United States Trustee for the Southern District of New York, (j) the Securities and Exchange Commission, (k) the Internal Revenue Service, (l) the United States Department of Justice; and (m) Ken Coleman, Esq., Allen & Overy, as counsel for the Monitor.  The Debtors submit that no other or further notice of this Motion is required.  A copy of the Motion is also freely available on the website of the Debtors' proposed claim and noticing agent, Donlin, Recano & Company, Inc. ("Donlin, Recano") at www.donlinrecano.com.

**No Prior Request**

107.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request an entry of an Interim Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to continue to pay and honor the Employee Obligations specifically as set forth herein; (b) authorizing the

Debtors to continue to provide the Employee Benefits in the ordinary course of business;

(c) authorizing the Debtors to pay all related costs and expenses; and (d) directing banks to

receive, honor and pay all checks and electronic payment requests related to the foregoing; and

(e) granting such other further relief as is just and proper.

Dated: January 22, 2008               Respectfully submitted,
       New York, New York

   /s/ Michael J. Canning_____

Michael J. Canning (MC 8060)

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
Telephone: (212) 715-1000
Facsimile:  (212) 715-1399

*Proposed Counsel for the Debtors
and Debtors In Possession*

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Quebecor World (USA) Inc., <u>et al.</u>, | Case No. 08-10152 (___)<br>Jointly Administered |
| Debtors. | Honorable _____ |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO CONTINUE
TO PAY AND HONOR CERTAIN PREPETITION CLAIMS FOR
(I) WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER
COMPENSATION, (II) WITHHOLDINGS AND DEDUCTIONS AND
(III) REIMBURSABLE EXPENSES; (B) AUTHORIZING THE DEBTORS
TO CONTINUE TO PROVIDE EMPLOYEE BENEFITS IN THE
ORDINARY COURSE OF BUSINESS; (C) AUTHORIZING THE
DEBTORS TO PAY ALL RELATED COSTS AND EXPENSES;
(D) DIRECTING BANKS TO RECEIVE, PROCESS, HONOR AND PAY
ALL CHECKS PRESENTED FOR PAYMENT AND ELECTRONIC
PAYMENT REQUESTS RELATING TO THE FOREGOING;
AND (E) SETTING A FINAL HEARING**

Upon the motion (the "Motion")[1] of the above-captioned debtors (collectively, the

"Debtors") for entry of an Interim Order (a) authorizing the Debtors to continue to pay and honor

certain prepetition claims for, among other things (i) wages, salaries and other compensation, (ii)

withholdings and deductions and (iii) reimbursable employee expenses; (b) authorizing the

Debtors to continue to provide all employee health benefits and all other employee benefits in

the ordinary course of business; (c) authorizing the Debtors to pay all related costs and expenses;

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the
Motion.

(d) directing banks to receive, honor and pay all checks and electronic payment requests related to the foregoing; and (e) setting a final hearing; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the Debtors will suffer immediate and irreparable harm within the context of Bankruptcy Rule 6003 should this Interim Order not be entered; notice of this Motion and the opportunity for a hearing on this Motion was appropriate under the particular circumstances and that no other or further notice need by given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized to pay the accrued prepetition Wages and Benefits to the Employees.

3.      The Debtors are authorized to pay each Employee his or her portion of the Profit Sharing Plans which accrued prepetition or are related to the prepetition period, so long as the total compensation to the Employee is less than $10,950.

4.      The Debtors are authorized to (a) forward the prepetition Deductions to the applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date and (b) honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, in the ordinary course of business.

5.      The Debtors are authorized to (a) continue reimbursing the Reimbursable Expenses, in accordance with prepetition practices, (b) modify their prepetition policies relating

thereto as they deem appropriate and (c) pay all Reimbursable Expenses that relate to the prepetition period.

6.      The Debtors are authorized to continue to honor the Employee Benefits described in the Motion on a postpetition basis, and to pay any obligations owing with respect thereto, including any obligations incurred prior to the Petition Date.

7.      The Debtors are authorized to (a) allow their Employees to take Vacation Time in the ordinary course of business on a going forward basis including Vacation Time accrued for work prior to the Petition Date and (b) pay Unpaid Vacation upon termination or retirement in accordance with prior practice.

8.      All applicable banks and other financial institutions are authorized and directed, when requested by the Debtors, in the Debtors' sole discretion, to receive, process, honor and pay any and all checks drawn on the Debtors' accounts in respect of Employee Wages and Benefits, Commissioned Employees, related Deductions and Withholdings, Reimbursable Expenses, Prepetition Processing Costs, Employee Obligations to the Employees on account of any uncashed checks issued in connection with the payroll issued immediately prior to the Petition Date, and such other payments as authorized by this Order, whether such checks were presented prior to or after the Petition Date; provided that sufficient funds are available in the Debtors' bank accounts or under postpetition financing facility to cover such payments; and provided further, that all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Order.

9.     The Debtors are authorized to issue new checks or electronic transfers on a postpetition basis on account of the obligations set forth above in the event that their banks or financial institutions fail to honor the payment of such prepetition obligations.

10.     The Debtors retain the right to modify, change and discontinue any of the Employee Obligations and Benefits, and the policy related to the Reimbursable Expenses and to implement new Employee Obligations and Benefits in the ordinary course of business during the Chapter 11 Cases in their sole discretion without the need for further Court approval.  The forgoing is not intended to modify the Debtors' obligations under any applicable collective bargaining agreement.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

12.     A Final Hearing is set for February _____2008, at _____, on this Motion, as well as any subsequent motion filed by the Debtors with respect to employee compensation as long as such motion is filed by February 1, 2008.

13.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.     The requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Application or otherwise waived.

15.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  January _____, 2008

_____
United States Bankruptcy Judge